UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BRIANA LEAKAS, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>MONTEREY BAY MILITARY HOUSING, LLC, et al.,<br><br>    Defendants. | Case No. 22-cv-01422-VKD<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF ANDREW HEYMAN, M.D.**<br><br>Re: Dkt. No. 54 |

## I.  BACKGROUND

Plaintiffs Briana Leakas and her minor son, D.L. (along with Theodore Leakas, Ms. Leakas's spouse and D.L.'s guardian ad litem), filed this action in the Monterey County Superior Court for personal injuries they claim they sustained as a result of toxic mold contamination in the home they leased from defendants[1] while living on the U.S. Army Garrison Presidio of Monterey from about June 2019 through May 2020. Defendants removed the matter to this Court on the ground that the underlying events occurred on a federal enclave. *See* Dkt. No. 4; *see also Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 749 (9th Cir. 2022) ("[B]ecause conduct on a federal enclave is generally subject to federal law, a claim based on injuries stemming from such conduct arises under federal law, and a court has jurisdiction over such a claim under [28 U.S.C.]

---

[1] Plaintiffs voluntarily dismissed two defendants (Clark Enterprises USA, LLC and Pinnacle Monterey, LLC) and later dropped defendant Clark Pinnacle Monterey Bay, LLC from their operative complaint. *See* Dkt. Nos. 11, 12, 34. The two remaining defendants are Monterey Bay Military Housing, LLC and Michaels Management Services, LLC. Plaintiffs and all remaining defendants have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 8, 10, 21.

§ 1331."); *Albers v. Yarbrough World Sols., LLC*, No. 5:19-cv-05896-EJD, 2020 WL 2218964, at *7 (N.D. Cal. May 7, 2020) ("The California Legislature ceded the Monterey Presidio to the United States Government in 1897.  It is not contested by the Parties and the case law supports that, when California ceded the Presidio to the United States, exclusive jurisdiction over that area was conferred upon the United States.") (citations omitted).

After the Court granted defendants' motion to dismiss the complaint with leave to amend, (*see* Dkt. No. 32), plaintiffs filed an amended complaint (the operative pleading), which asserts ten state and common law claims for relief:  negligence (claim 1); nuisance (claim 2); negligent misrepresentation (claim 3); negligent infliction of emotional distress (claim 4); breach of implied warranty of habitability (claim 5); breach of implied covenant of quiet use and enjoyment (claim 6); gross negligence (claim 7);[2] premises liability (claim 8); constructive (wrongful) eviction (claim 9); and fraud—concealment (claim 10).  Dkt. No. 34.

Defendants move to exclude the testimony of one of plaintiffs' retained medical experts, Andrew Heyman, M.D.  Dr. Heyman states that he is board-certified in Integrative Medicine and Anti-Aging and Regenerative Medicine, and claims expertise in "Biotoxin Illness and Chronic Inflammatory Response Syndrome (CIRS)."  *See* Dkt. No. 59-1 ¶¶ 4, 5; *see also* Dkt. No. 59-2, Ex. 2.  He proposes to testify that Ms. Leakas meets diagnostic criteria for CIRS as a result of exposure to mold at the subject property, leading to immune dysfunction, fatigue, chronic inflammation, neuropsychiatric symptoms, "and a variety of other health complaints."  Dkt. No. 59-2, Ex. 3 at ECF 42; *see also* Dkt. No. 59-1 ¶ 3.

Defendants contend that Dr. Heyman's proposed testimony does not meet the admissibility requirements of Rule 702 of the Federal Rules of Evidence.  Their contention principally rests on two grounds.  First, defendants argue that CIRS is not a diagnosis that is generally accepted within the medical community.  Second, defendants argue that Dr. Heyman's opinions are not based on reliable methodologies, medical testing, or data; relatedly, they argue that Dr. Heyman is not

---

[2] Pursuant to the Court's order on defendants' motion to dismiss, plaintiffs were permitted to pursue a claim for gross negligence, but only in the alternative to their separate claim for negligence.  *See* Dkt. No. 32 at 12.

2

1  qualified to opine about whether Ms. Leakas was exposed to mold and whether that alleged
2  exposure caused her symptoms. Dkt. Nos. 54, 60. Plaintiffs oppose the motion. Dkt. No. 59.
3  Following the motion hearing, and with the Court's leave, plaintiffs supplemented their opposition
4  by submitting copies of the studies or papers they say support their contentions. *See* Dkt. Nos. 68,
5  69. Upon consideration of the moving and responding papers, as well as the oral arguments
6  presented, the Court grants defendants' motion to exclude Dr. Heyman's testimony.

## II.  LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides that a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise," if the proponent of the testimony "demonstrates that it is more likely than not" that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 recently was amended, effective December 1, 2023, "to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

Rule 703 further identifies the permissible bases of an expert's opinion testimony, including "facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. Additionally, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, [the facts or data] need not be admissible for the opinion to be admitted." *Id*. "But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." *Id*.

Expert testimony is admissible under Rule 702 if it is both relevant and reliable. *See*

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The determination of whether expert testimony is admissible is a matter within the Court's discretion, *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142 (1999); *Gen'l Elec. Co. v. Joiner*, 522 U.S. 136, 141-43 (1997), and "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue," *Daubert*, 509 U.S. at 592-93. This "basic gatekeeping obligation" applies to all expert testimony, not just scientific testimony. *Kumho*, 526 U.S. at 147. Additionally, the Court's inquiry is a flexible one, and "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id*. at 153. The proponent of expert testimony has the burden of proving admissibility. *Lust v. Merrell Dow Pharm., Inc*., 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

## III.     DISCUSSION

### A.     Dr. Heyman's CIRS Diagnosis

Defendants contend that Dr. Heyman's proposed testimony is unreliable because CIRS is not a diagnosis that is generally accepted within the medical community. Defendants cite to two papers, including one by the American College of Occupational and Environmental Medicine and one by the American Academy of Allergy, Asthma, and Immunology, which discuss that mold exposure has been found to impact human health through three mechanisms—namely, allergy and other hypersensitivity reactions, infection, and toxicity. *See* Dkt. No. 54-1, Ex. B (Hardin, et al., "Adverse Human Health Effects Associated with Molds in the Indoor Environment," Journal of Occupational and Environmental Medicine, Vol. 45, No. 5, May 2003); *id*., Ex. C (Bush, et al. "The medical effects of mold Exposure," Journal of Allergy and Clinical Immunology, Vol. 11 7, No. 2, 2006). Additionally, defendants cite to a more recent submission by the Royal Australasian College of Physicians ("RACP") to the Australian Parliament's Health, Aged Care and Sport Committee Inquiry into Biotoxin-related Illnesses, espousing the view that "[p]resently, sufficient research has not been conducted nor consensus reached for the terms 'biotoxin-related illnesses' or 'Chronic Inflammatory Response Syndrome (CIRS)' to be used as valid diagnostic labels." Dkt.

4

No. 60 at 3 (quoting The Royal Australasian College of Physicians (RACP), RACP Submission to the Australian Parliament's Health, Aged Care and Sport Committee Inquiry into Biotoxin-related Illnesses in Australia, 2018).

Citing to the declaration of Dr. Heyman submitted with their opposition, plaintiffs contend that "CIRS" is merely a "jargon" term that is used by members of the "'mold' medical community" to describe a "functionally equivalent" condition known as "SIRS" (Systemic Inflammatory Response Syndrome). Dkt. No. 59 at 6-7; Dkt. No. 59-1 ¶ 14. There is no apparent dispute that SIRS is a recognized diagnosis within the medical community. *See* Dkt. No. 59 at 6-7; Dkt. No. 60 at 4 n.2. Plaintiffs therefore maintain that "Dr. Heyman's testimony related to CIRS may be accurately evaluated in scope and legitimacy through the lens of SIRS." Dkt. No. 59 at 7. While the article plaintiffs cite says that CIRS is "modeled after" SIRS, it does not support plaintiffs' contention that "CIRS" and "SIRS" are merely different labels for the same diagnosis. *See* Dkt. No. 59 at 7 n.1 (citing Shoemaker, et al, "Review of Diagnostic process for chronic inflammatory response syndrome (CIRS): a consensus statement report of the consensus committee of surviving mold," Internal Medicine Review, 4(5)). The parties also dispute the significance (or lack thereof) of the existence of an International Classification of Diseases code for CIRS, and the Government Accountability Office's case definition of a biotoxin-based illness, and how that may bear on the general acceptability of CIRS as a diagnosis. *See* Dkt. No. 54 at 4; Dkt. No. 59 at 8.

A court may admit somewhat questionable testimony if it falls within "the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts, even though the evidence is 'shaky.'" *Kumho*, 526 U.S. at 153 (citing *Daubert*, 509 U.S. at 596). On the record presented, plaintiffs have not demonstrated that Dr. Heyman's CIRS diagnosis falls within that range. But even assuming that the validity of Dr. Heyman's CIRS diagnosis is a matter more appropriately left to cross-examination and presentation of evidence at trial, the fundamental issue raised by defendants' *Daubert* motion is that Dr. Heyman's opinions that the alleged exposure to mold *caused* Ms. Leakas's health conditions do not meet Rule 702 admissibility requirements. For the reasons discussed below, the Court agrees.

### B. Dr. Heyman's Qualifications and Methodologies

According to his August 2023 expert report, plaintiffs retained Dr. Heyman in this litigation "to review and analyze whether chronic mold and mycotoxin exposure cause chronic inflammation, immune system dysfunction, and neurological difficulties and whether they did so for the [plaintiffs]." Dkt. No. 59-2, Ex. 3 at ECF 24. Dr. Heyman further states that he was asked to provide his opinion "based on information made available to [him] and in the public domain, and the application of [his] years of education, experience, and training as an expert on the health effects of molds and mycotoxins, public health and epidemiology." *Id.* There is no indication that Dr. Heyman met with or examined Ms. Leakas in preparing his opinions. Rather, his report indicates that he reviewed a number of documents, including Ms. Leakas's medical records, various test reports, and literature, as well as the expert report of another of plaintiffs' retained medical experts, David Ross, M.D.[3] *Id.*

Dr. Heyman describes CIRS as "[s]ystemic inflammation" that "appears as a multi-symptom, multi-system illness caused by exposure to biotoxins or neurotoxins derived from a biological source." *Id.* at ECF 35. He opines that Ms. Leakas "suffered from mold exposure leading to immune dysfunction, complex systemic inflammation, and neurological challenges attributable to multiple exposures to amplified microbial growth," and that "it is more likely than not that [she] meets diagnostic criteria for a biotoxin induced system inflammatory illness due to exposure to a water damaged building[.]" *Id.* at ECF 33, 42; *see also* Dkt. No. 59-1 ¶ 3. Dr. Heyman further states that "there is no minimum threshold of mold or time of exposure that will render a patient sick" and that "there is no level of exposure required to have an immunological and inflammatory response to mold exposure." Dkt. No. 59-2, Ex. 3 at ECF 35.

Dr. Heyman's report indicates that among the diagnostic criteria he applied to Ms. Leakas is the requirement that "[t]he patient must have an exposure to a biotoxin causing illness verified by the presence of visible mold or mycological testing." Dkt. No. 59-2, Ex. 3 at ECF 38. Noting that he "personally reviewed [plaintiffs'] mold reports in connection to their medical records and

---

[3] The Court will separately address defendants' *Daubert* motion to exclude Dr. Ross's proposed testimony.

the timing of their symptoms," Dr. Heyman concludes that Ms. Leakas "has a known exposure to a water-damaged building" and that "[plaintiffs] were exposed to sufficient levels of mold for a sufficient period of time to cause an inflammatory and immune reaction." *Id.* At the motion hearing, there appeared to be no dispute that the alleged exposure at issue in this case is exposure to airborne mold (as opposed to, for example, exposure via ingestion of mold).

Defendants argue that Dr. Heyman cannot reliably testify—based on his review of records conducted years after Ms. Leakas moved out of the subject property—that alleged mold exposure caused her health conditions. Defendants contend that Dr. Heyman is not qualified, in the first instance, to make such a determination. However, their objection to Dr. Heyman's proposed testimony is principally based on their contention that his opinions are not the product of reliable principles or methods, or a reliable application of any such principles and methods to the particular facts of this case. Dkt. No. 54 at 4-8.

### 1.     Dr. Heyman's Qualifications

Dr. Heyman indisputably is not a certified industrial hygienist or toxicologist. *See, e.g.,* Dkt. No. 54-1, Ex. E (Heyman Dep. at 32:17-21).[4] As such, defendants contend that he lacks the qualifications either to determine that Ms. Leakas was exposed to a known water-damaged building (and any biotoxins or mycotoxins that may have been in such an environment), or to interpret the available environmental test data as supporting his conclusions. Dkt. No. 54 at 5. Here, defendants point out that the available environmental testing data includes a July 2020 air sample report that did not "indicate amplified and/or elevated airborne mold" and noted that the property conditions were "optimal." Dkt. No. 54-1, Ex. G. Additionally, defendants contend that swab testing in August 2020 did not reveal hazardous levels of mold at the property. *See id.*, Ex. H.

---

[4] At the motion hearing, the parties advised that, for health-related reasons, Dr. Heyman would not be available for a deposition until late January 2024. It is not clear whether Dr. Heyman's deposition has been conducted. In the meantime, defendants have submitted excerpts of deposition testimony that Dr. Heyman gave in a different toxic mold case pending in the Southern District of California, *Phipps v. Camp Pendleton Military Housing, et al*, Case No. 3:21-cv-01514 DMS-MMP ("*Phipps*"). Although much of that testimony appears to be specific to the facts in *Phipps*, Dr. Heyman's testimony that he is not a certified industrial hygienist or toxicologist are germane to the discussion here.

Noting that the referenced environmental testing was done after the subject property was remediated, plaintiffs argue that those reports do not accurately reflect the condition of the property while they lived there. However, they have not presented any other tests or reports regarding the condition of the property, and Dr. Heyman refers to no other tests or reports. Nor do plaintiffs offer any evidence rebutting defendants' contention that Dr. Heyman lacks the scientific, technical, or other specialized knowledge to opine that there was "an exposure to a biotoxin causing illness verified by the presence of visible mold or mycological testing," or that plaintiffs "were exposed to sufficient levels of mold for a sufficient period of time to cause an inflammatory and immune reaction." Dkt. No. 59-2, Ex. 3 at ECF 38; Dkt. No. 59 at 9. Instead, at oral argument, plaintiffs stated that they have a certified industrial hygienist, who has been retained to offer an expert opinion regarding the condition of the subject property and plaintiffs' exposure to mold. However, plaintiffs were unable to point to anything in Dr. Heyman's report indicating that he reviewed or relied on the findings of plaintiffs' industrial hygienist in reaching his own conclusions.

### 2. Dr. Heyman's Diagnostic Criteria

Plaintiffs maintain that even though Dr. Heyman is not an industrial hygienist or toxicologist, he may still properly offer his opinions regarding causation if he applies "the principles of toxicology." Dkt. No. 59 at 9.[5] Defendants contend that Dr. Heyman did not apply any such reliable principles in this case. For example, they point out that other courts, including the court in the *Phipps* action, have observed that "[t]he most widely-used method of demonstrating causation in toxic tort cases is to present scientifically-accepted information about the dose-response curve for the toxin which confirms that the toxin can cause the health effects experienced by the plaintiff at the dosage plaintiff was exposed to," *Young v. Burton*, 567 F. Supp. 2d 121, 128 (D.D.C. 2008), and that Dr. Heyman did not use a dose-response approach in

---

[5] The Court does not find the language plaintiffs purport to quote for this proposition in their citation to *Wade-Greaux v. Whitehall Lab., Inc.*, 874 F. Supp. 1441, 1578 (D.V.I. 1994). *See* Dkt. No. 59 at 9. In *Wade-Greaux*, the defendants prevailed on their motion for summary judgment that the opinions of plaintiffs' experts were inadmissible and insufficient, as a matter of law, on the issue of causation.

8

attributing Ms. Leakas's health conditions to mold exposure. *See* Dkt. No. 54-1, Ex. K at 8-9, 13.

There may be multiple ways by which an expert may demonstrate causation. Plaintiffs argue that Dr. Heyman "rigorously applied an evidence-based test in accordance with the most recent published research to form a basis for his diagnosis." Dkt. No. 59 at 9. That "most recent published research" apparently is an article that plaintiffs cite in their opposition as: "Keith Berndtson, Scott McMahon, Mary Ackerley, Sonia Rapaport, Sandeep Gupta, Ritchie C. Shoemaker. CONSENSUS STATEMENT: Part 1 Medically sound investigation and remediation of water-damaged buildings in cases of CIRS-WDB. 2015." That article has not been presented to the Court. Moreover, it is not clear what test or other methodology Dr. Heyman used in formulating the diagnostic criteria on which he relies. *See* Dkt. No. 59-2, Ex. 3 at ECF 38-40; *see also* Dkt. No. 59-2, Ex. 4 at ECF 60. Even assuming that an "evidence-based test" described in the Berndtson article is the basis for Dr. Heyman's diagnostic criteria, plaintiffs have not identified the standards for that "evidence-based test," demonstrated how rigorous those standards are, or explained how (if at all) that test or its standards comport with reliable "principles of toxicology."

Plaintiffs misplace their reliance on *Brancati v. Cachuma Village, LLC*, 96 Cal. App. 5th 499 (2023), which is readily distinguishable from the present action in at least two significant respects. Unlike the present matter, test data regarding the property at issue in *Brancati* revealed "*high levels*" of mold. *Brancati*, 96 Cal. App. 5th at 436. Additionally, the expert in question was a board-certified allergist and immunologist who opined about the adverse impacts of mold on the plaintiff's respiratory tract—a recognized health impact of exposure to mold. *Id*. at 430. While plaintiffs have submitted articles that appear generally to espouse the view that human exposure to mold may cause an inflammatory response, leading to neurologic and neuropsychiatric symptoms (*see* Dkt. No. 69), for the reasons discussed below, the Court finds that they have not met their burden to establish that Dr. Heyman has, more likely than not, reliably linked plaintiffs' alleged exposure to mold, from years ago, to Ms. Leakas's health conditions.

### 3. Dr. Heyman's Differential Diagnosis

Defendants assert that Dr. Heyman's opinion is inadmissible because he failed to perform an adequate differential diagnosis. "Differential diagnosis, or differential etiology, is a standard

9

United States District Court
Northern District of California

1    scientific technique of identifying the cause of a medical problem by eliminating the likely causes
2    until the most probable one is isolated." *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1057 (9th
3    Cir. 2003) (citation omitted).  While it is true that an expert properly may rely on his extensive
4    clinical experience in making a differential diagnosis, the proper performance of a differential
5    diagnosis involves "first assum[ing] the pertinence of all potential causes, then rul[ing] out the
6    ones as to which there is no plausible evidence of causation, and then determin[ing] the most
7    likely cause among those that cannot be excluded." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d
8    1227, 1234, 1237 (9th Cir. 2017).  Thus, "[t]he first step in the diagnostic process is to compile a
9    comprehensive list of hypotheses that might explain the set of salient clinical findings under
10   consideration." *Clausen*, 339 F.3d at 1057.  "After the expert rules in all of the potential
11   hypotheses that might explain a patient's symptoms, he or she must then engage in a process of
12   elimination, eliminating hypotheses on the basis of a continuing examination of the evidence so as
13   to reach a conclusion as to the most likely cause of the findings in that particular case." *Id.* at
14   1058.  "The expert must provide reasons for rejecting alternative hypotheses 'using scientific
15   methods and procedures' and the elimination of those hypotheses must be founded on more than
16   'subjective beliefs or unsupported speculation.'" *Id.* at 1058 (quoting *Claar v. Burlington N. R.R.
17   Co.*, 29 F.3d 499, 502 (9th Cir.1994)).  Properly conducted differential diagnoses are generally
18   admissible under *Daubert*.  *Id.* at 1057.  However, a district court may exclude proposed expert
19   evidence if the expert fails to explain why an alternative cause was ruled out.  *Id.* at 1058.

20   Here, Dr. Heyman does little more than state that he "ruled in biotoxin illness August 2023
21   based upon this review," and that "[o]ther diseases are ruled out via a thorough differential
22   diagnosis workup."  Dkt. No. 59-2, Ex. 3 at ECF 38.  By "this review," Dr. Heyman presumably
23   refers to his August 2023 review of records.  However, it is unclear what his "thorough differential
24   diagnosis workup" entailed, or how that analysis led him to rule out other potential causes of Ms.
25   Leakas's health conditions.[6]  Dr. Heyman notes, as a general proposition, that literature indicates
26   that "[p]atients with CIRS are often misdiagnosed as having depression, anxiety, PTSD,

---

[6] The Court finds it unnecessary to address defendants' additional arguments that Dr. Heyman used unreliable tests or indicators to rule in CIRS.  *See* Dkt. No. 54 at 6-8.

1  somatization, Alzheimer's, allergy, ADD/ADHD, fibromyalgia and Chronic Fatigue Syndrome."

2  *Id*. He further states that Ms. Leakas "had a comprehensive medical evaluation that can serve to

3  rule out other causes," and that he

> considered a differential diagnosis [for] [Ms. Leakas], reviewed her medical history, and have ruled out any other cause for [her] respective chronic inflammatory condition, immune suppression, and neurological challenges. She does not suffer from a systemic autoimmune condition, diabetes, thyroid disorder, isolated mental health condition, metabolic disorder, central neurologic condition, or other known medical illness that would explain their symptoms.

*Id*. Nowhere does he explain how he reached those conclusions with respect to Ms. Leakas, let alone the "scientific methods and procedures" or other reliable methodology he used to eliminate other potential causes. *Clausen*, 339 F.3d at 1058. At the motion hearing, plaintiffs did not dispute that Dr. Heyman's report does not discuss his differential diagnosis in any detail; they asserted that they believed he intended to provide further explanation in his deposition. Although it is unclear whether Dr. Heyman's deposition has been taken, on the record presented, Dr. Heyman's report does not explain how he reached his conclusion that other potential causes of Ms. Leakas's condition may be ruled out. Such omission is of particular concern, as there is no apparent dispute that Ms. Leakas suffers from a number of other medical conditions, including conditions that defendants contend existed before she moved to the subject property. Furthermore, Rule 26(a)(2) requires a testifying expert to disclose in his expert report "a complete statement of all opinions . . . and the basis and reasons for them," and "the facts or data considered . . . in forming [the opinions]." Fed. R. Civ. P. 26(a)(2)(B)(i), (ii). Dr. Heyman's omits this required disclosure and his opinion therefore is inadmissible as a differential diagnosis.

## IV.  CONCLUSION

Based on the foregoing, plaintiffs have not met their burden to establish that it is more likely than not that Dr. Heyman's proposed testimony meets the admissibility requirements of

///

///

///

///

11

1   Rule 702.  Accordingly, defendants' motion to exclude Dr. Heyman's testimony is granted.

2   **IT IS SO ORDERED.**

3   Dated: February 8, 2024

Virginia K. DeMarchi
United States Magistrate Judge