UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BRIANA LEAKAS, et al.,<br><br>   Plaintiffs,<br><br>   v.<br><br>MONTEREY BAY MILITARY HOUSING, LLC, et al.,<br><br>   Defendants. | Case No. 22-cv-01422-VKD<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DAVID ROSS, M.D.**<br><br>Re: Dkt. No. 53 |

## I.  BACKGROUND

Plaintiffs Briana Leakas and her minor son, D.L. (along with Theodore Leakas, Ms. Leakas's spouse and D.L.'s guardian ad litem), filed this action in the Monterey County Superior Court for personal injuries they claim they sustained as a result of toxic mold contamination in the home they leased from defendants[1] while living on the U.S. Army Garrison Presidio of Monterey from about June 2019 through May 2020. Defendants removed the matter to this Court on the ground that the underlying events occurred on a federal enclave. *See* Dkt. No. 4; *see also Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 749 (9th Cir. 2022) ("[B]ecause conduct on a federal enclave is generally subject to federal law, a claim based on injuries stemming from such conduct arises under federal law, and a court has jurisdiction over such a claim under [28 U.S.C.]

---

[1] Plaintiffs voluntarily dismissed two defendants (Clark Enterprises USA, LLC and Pinnacle Monterey, LLC) and later dropped defendant Clark Pinnacle Monterey Bay, LLC from their operative complaint. *See* Dkt. Nos. 11, 12, 34. The two remaining defendants are Monterey Bay Military Housing, LLC and Michaels Management Services, LLC. Plaintiffs and all remaining defendants have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 8, 10, 21.

§ 1331."); *Albers v. Yarbrough World Sols., LLC*, No. 5:19-cv-05896-EJD, 2020 WL 2218964, at *7 (N.D. Cal. May 7, 2020) ("The California Legislature ceded the Monterey Presidio to the United States Government in 1897.  It is not contested by the Parties and the case law supports that, when California ceded the Presidio to the United States, exclusive jurisdiction over that area was conferred upon the United States.") (citations omitted).

After the Court granted defendants' motion to dismiss the complaint with leave to amend, (*see* Dkt. No. 32), plaintiffs filed an amended complaint (the operative pleading), which asserts ten state and common law claims for relief:  negligence (claim 1); nuisance (claim 2); negligent misrepresentation (claim 3); negligent infliction of emotional distress (claim 4); breach of implied warranty of habitability (claim 5); breach of implied covenant of quiet use and enjoyment (claim 6); gross negligence (claim 7);[2] premises liability (claim 8); constructive (wrongful) eviction (claim 9); and fraud—concealment (claim 10).  Dkt. No. 34.

Defendants move to exclude the testimony of one of plaintiffs' retained medical experts, David Ross, M.D., a board-certified neuropsychiatrist.  Dkt. No. 53.  Based on his June 28, 2023 examination of Ms. Leakas and a review of her medical records and other documents, Dr. Ross concluded that due to biotoxin (i.e., mold) exposure at the home plaintiffs leased in Monterey, Ms. Leakas developed an acquired brain injury caused by CIRS (i.e., Chronic Inflammatory Response Syndrome), a mold-related illness.  Dkt. No. 57-1 ¶¶ 3, 7; *see also* Dkt. No. 57-2, Ex. 1. Defendants contend that Dr. Ross is not qualified to opine on medical causation and other issues beyond his expertise in neuropsychiatry.  Dkt. No. 53.  They further contend that Dr. Ross's opinion that Ms. Leakas has an acquired brain injury caused by CIRS is not based on reliable medical testing and data.  *Id*.  Plaintiffs oppose the motion.  Dkt. No. 57.  Following the motion hearing, and with the Court's leave, plaintiffs supplemented their opposition by submitting copies of the studies or papers they say support their contentions.  *See* Dkt. Nos. 68, 69.  Upon consideration of the moving and responding papers, as well as the oral arguments presented, the

---

[2] Pursuant to the Court's order on defendants' motion to dismiss, plaintiffs were permitted to pursue a claim for gross negligence, but only in the alternative to their separate claim for negligence.  *See* Dkt. No. 32 at 12.

United States District Court
Northern District of California

1  Court grants in part and denies in part defendants' motion to exclude Dr. Ross's testimony.

2  **II.   LEGAL STANDARD**

3  Rule 702 of the Federal Rules of Evidence provides that a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise," if the proponent of the testimony "demonstrates that it is more likely than not" that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 recently was amended, effective December 1, 2023, "to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."  Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

Rule 703 further identifies the permissible bases of an expert's opinion testimony, including "facts or data in the case that the expert has been made aware of or personally observed."  Fed. R. Evid. 703.  Additionally, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, [the facts or data] need not be admissible for the opinion to be admitted."  *Id*.  "But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."  *Id*.

Expert testimony is admissible under Rule 702 if it is both relevant and reliable.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  The determination of whether expert testimony is admissible is a matter within the Court's discretion, *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142 (1999); *Gen'l Elec. Co. v. Joiner*, 522 U.S. 136, 141-43 (1997), and "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be

3

1  applied to the facts in issue," *Daubert*, 509 U.S. at 592-93.  This "basic gatekeeping obligation"

2  applies to all expert testimony, not just scientific testimony.  *Kumho*, 526 U.S. at 147.

3  Additionally, the Court's inquiry is a flexible one, and "whether *Daubert*'s specific factors are, or

4  are not, reasonable measures of reliability in a particular case is a matter that the law grants the

5  trial judge broad latitude to determine."  *Id*. at 153.  The proponent of expert testimony has the

6  burden of proving admissibility.  *Lust v. Merrell Dow Pharm., Inc*., 89 F.3d 594, 598 (9th Cir.

7  1996); *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

## III. DISCUSSION

### A. Dr. Ross's Qualifications

An expert may be qualified as such "by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  Rule 702 "contemplates a broad conception of expert qualifications," and the rule "is broadly phrased and intended to embrace more than a narrow definition of qualified expert."  *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994).  "The determination whether an expert witness has sufficient qualifications to testify is a matter within the district court's discretion."  *United States v. Little*, 753 F.2d 1420, 1455 (9th Cir. 1984).

Dr. Ross is board-certified in general psychiatry (since 1994), neuropsychiatry (since 2010), and brain injury medicine (since 2014).  He says that he specializes in the treatment and research of patients with traumatic and other types of brain injury and describes his "[m]ajor career interests" as "[t]raumatic brain injury, MRI brain volume measurement, acquired brain injury, mold-related illness, and other neuropsychiatric disorders."  Dkt. No. 57-2, Ex. 2 at 3-4.  In deposition, he testified that his treatment of patients with mold-related brain injury focuses on neuropsychiatric issues, and not on other medical issues.  *See* Dkt. No. 53-1, Ex. B (Ross Dep. at 23:9-20).

In his report, Dr. Ross states that Ms. Leakas has an acquired brain injury that resulted in various impairments, including a number of non-neuropsychiatric conditions.  *See* Dkt. No. 57-2, Ex. 1 at 35-37. Defendants argue that to the extent Dr. Ross is permitted to testify at all, his testimony should be limited to his specialization in the field of neuropsychiatry and that he should

4

1  not be permitted to offer opinions regarding impairments in Ms. Leakas's allergic/immunologic
2  system, dermatological system, sexual and reproductive system, musculoskeletal system,
3  gastrointestinal system, and others. *See* Dkt. No. 53 at 3. Plaintiffs argue that as a
4  neuropsychiatrist, Dr. Ross is qualified to testify about "various systems' interconnectivity in the
5  human body." *See* Dkt. No. 57 at 6.

6      Dr. Ross's opinion goes beyond testifying about the interconnectivity of systems in the
7  human body. The import of his proposed testimony is that plaintiffs' alleged exposure to mold at
8  the subject property led to a number of neuropsychiatric and other medical issues. Dr. Ross is
9  qualified to opine that, based on his evaluation, Ms. Leakas has brain abnormalities. Dr. Ross is
10 also qualified to testify about whether and to what extent Ms. Leakas's brain abnormalities may be
11 *consistent* with neuropsychiatric symptoms or conditions he has observed in his treatment of
12 patients with mold-related brain injuries. However, plaintiffs have not met their burden to show
13 that Dr. Ross is qualified to opine on other medical issues beyond neuropsychiatric symptoms or
14 conditions.

15     Additionally, Dr. Ross is not qualified to testify regarding Ms. Leakas's long-term care or
16 life-care planning needs. *See* Dkt. No. 57-2, Ex. 1 at 39-40. Defendants contend that he does not
17 have knowledge, training, or experience to offer expert testimony on such matters. *See* Dkt. No.
18 61 at 9-10. Plaintiffs presented no evidence or argument in response, and have failed to
19 demonstrate that Dr. Ross's proposed testimony regarding Ms. Leakas's long-term care or life-
20 care planning needs meets the admissibility requirements of Rule 702.

21     **B.**    **Dr. Ross's Diagnosis of Mold-Related Acquired Brain Injury**

22     Defendants' challenge to Dr. Ross's proposed testimony rests principally on their
23 contention that he cannot reliably testify, based on his evaluation conducted several years after she
24 moved out of the subject property, that Ms. Leakas has an acquired brain injury that was caused by
25 CIRS due to mold exposure. At the motion hearing, defendants clarified that they do not contest
26 that a May 2023 MRI of Ms. Leakas's brain shows that she has brain abnormalities. Nor do they
27 contend that Dr. Ross lacks qualifications to evaluate that MRI or to assess that she has brain
28 abnormalities based on that evaluation. However, defendants assert that Dr. Ross's conclusion

1    that Ms. Leakas has an acquired brain injury that was *caused* by mold-related CIRS is unreliable
2    because (1) CIRS is not a diagnosis that is generally accepted within the medical community; and
3    (2) Dr. Ross's diagnostic methodology is not the product of reliable principles or methods, or a
4    reliable application of any such principles and methods to the particular facts of this case.

### 1. CIRS Diagnosis

Preliminarily, the Court agrees with defendants that Dr. Ross may not testify or suggest that Ms. Leakas's CIRS diagnosis is his own. *See* Dkt. No. 53 at 3-4. It is undisputed that Dr. Ross is not an ear-nose-throat doctor, a toxicologist, or an industrial hygienist. *See* Dkt. No. 53-1, Ex. B (Ross Dep. at 64:20-24, 65:19-66:2). Dr. Ross's report makes clear that he is relying on a CIRS diagnosis reportedly made by Ms. Leakas's treating providers. *See* Dkt. No. 57-2, Ex. 1 at 4, 24-25; *see also* Dkt. No. 53-1, Ex. B (Ross Dep. at 67:22-69:13). Additionally, Dr. Ross's report indicates that he also relied on "[d]iagnostic criteria for CIRS" of another of plaintiffs' retained experts, Andrew Heyman, M.D. *See* Dkt. No. 57-2, Ex. 1 at 24-25. As discussed in a separate order on defendants' motion to exclude Dr. Heyman's testimony, the Court has determined that Dr. Heyman's opinion is not sufficiently reliable to meet the admissibility requirements of Rule 702.

In any event, defendants argue that CIRS is not a generally accepted diagnosis in the medical community. They cite to two papers, including one by the American College of Occupational and Environmental Medicine and one by the American Academy of Allergy, Asthma, and Immunology, which discuss that mold exposure has been found to impact human health through three mechanisms—namely, allergy and other hypersensitivity reactions, infection, and toxicity. *See* Dkt. No. 54-1, Ex. B (Hardin, et al., "Adverse Human Health Effects Associated with Molds in the Indoor Environment," Journal of Occupational and Environmental Medicine, Vol. 45, No. 5, May 2003); *id*., Ex. C (Bush, et al. "The medical effects of mold Exposure," Journal of Allergy and Clinical Immunology, Vol. 11 7, No. 2, 2006).

Plaintiffs contend that "CIRS" is merely a "jargon" term that is used by members of the "'mold' medical community" to describe a "functionally equivalent" condition known as "SIRS" (Systemic Inflammatory Response Syndrome), "with the latter being 'widely accepted' within the

6

scientific community[.]" *See* Dkt. No. 57 at 9; *see also* Dkt. No. 59-1 ¶ 14.[3]  Plaintiffs therefore propose that Dr. Ross's "testimony related to CIRS may be accurately evaluated in scope and legitimacy through the lens of SIRS."  Dkt. No. 57 at 9.  While the article plaintiffs cite says that CIRS is "modeled after" SIRS, it does not support their contention that "CIRS" and "SIRS" are merely different labels for the same diagnosis.  *See* Dkt. No. 57 at 9 n.3 (citing Shoemaker, et al, "Review of Diagnostic process for chronic inflammatory response syndrome (CIRS): a consensus statement report of the consensus committee of surviving mold," Internal Medicine Review, 4(5)). The parties also dispute the significance (or lack thereof) of the existence of an International Classification of Diseases code for CIRS, and the Government Accountability Office's case definition of a biotoxin-based illness, and how that may bear on the general acceptability of CIRS as a diagnosis.  *See* Dkt. No. 53 at 5; Dkt. No. 57 at 10.

A court may admit somewhat questionable testimony if it falls within "the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts, even though the evidence is 'shaky.'"  *Kumho*, 526 U.S. at 153 (citing *Daubert*, 509 U.S. at 596).  On the record presented, plaintiffs have not demonstrated that Dr. Ross's CIRS diagnosis falls within that range.  But even assuming that the validity of CIRS as a generally accepted diagnosis is a matter more appropriately left to cross-examination and presentation of evidence at trial, the fundamental issue raised by defendants' *Daubert* motion is that Dr. Ross's opinions that Ms. Leakas's brain injury was caused by CIRS due to an alleged exposure to mold do not meet Rule 702 admissibility requirements.  For the reasons discussed below, the Court agrees.

### 2.  Dr. Ross's Differential Diagnosis

Defendants argue that in forming his conclusion that Ms. Leakas has an acquired brain injury caused by mold-related CIRS, Dr. Ross did not employ a reliable scientific or medical approach.  For example, they point out that other courts, including the court in another toxic mold

---

[3] Although plaintiffs do not expressly say so, they appear to be quoting from Dr. Heyman's declaration submitted in support of plaintiffs' opposition to defendants' motion to exclude Dr. Heyman's proposed testimony.

action pending in the Southern District of California ("*Phipps*"),[4] have observed that "[t]he most widely-used method of demonstrating causation in toxic tort cases is to present scientifically-accepted information about the dose-response curve for the toxin which confirms that the toxin can cause the health effects experienced by the plaintiff at the dosage plaintiff was exposed to," *Young v. Burton*, 567 F. Supp. 2d 121, 128 (D.D.C. 2008), and that Dr. Ross did not use a dose-response approach in attributing Ms. Leakas's brain injury to CIRS. *See* Dkt. No. 53-1, Ex. K at 8-9.

There may be multiple ways by which an expert may demonstrate causation. Plaintiffs assert that, using "objective methodologies in advance brain imaging techniques," and based on his experience, examination of Ms. Leakas, and a review of records and literature, Dr. Ross conducted a differential diagnosis and ruled in CIRS as the cause of Ms. Leakas's acquired brain injury, while ruling out other potential causes of her symptoms. *See* Dkt. No. 57 at 16.

"Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1057 (9th Cir. 2003) (citation omitted). While it is true that an expert properly may rely on his extensive clinical experience in making a differential diagnosis, the proper performance of a differential diagnosis involves "first assum[ing] the pertinence of all potential causes, then rul[ing] out the ones as to which there is no plausible evidence of causation, and then determin[ing] the most likely cause among those that cannot be excluded." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1234, 1237 (9th Cir. 2017). Thus, "[t]he first step in the diagnostic process is to compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration." *Clausen*, 339 F.3d at 1057. "After the expert rules in all of the potential hypotheses that might explain a patient's symptoms, he or she must then engage in a process of elimination, eliminating hypotheses on the basis of a continuing examination of the evidence so as to reach a conclusion as to the most likely cause of the findings in that particular case." *Id*. at 1058. "The expert must

---

[4] *Phipps v. Camp Pendleton Military Housing, et al*, Case No. 3:21-cv-01514 DMS-MMP.

provide reasons for rejecting alternative hypotheses 'using scientific methods and procedures' and the elimination of those hypotheses must be founded on more than 'subjective beliefs or unsupported speculation.'" *Id*. at 1058 (quoting *Claar v. Burlington N. R.R. Co*., 29 F.3d 499, 502 (9th Cir. 1994)). Properly conducted differential diagnoses are generally admissible under *Daubert*. *Id*. at 1057. However, a district court may exclude proposed expert evidence if the expert fails to explain why an alternative cause was ruled out. *Id*. at 1058.

Defendants maintain that Dr. Ross did not conduct a proper differential diagnosis based on reliable data, and instead offers opinions that are based on speculative reasoning and assumptions that are not supported by the facts in this case. While some of the matters raised by defendants may go to the weight, rather than the admissibility, of Dr. Ross's proposed testimony, on the whole Dr. Ross's differential diagnosis is circular. Although Dr. Ross says that his opinion is that Ms. Leakas has an acquired brain injury caused by mold-related CIRS, as noted above the referenced CIRS diagnosis is not his own. Rather, Dr. Ross's report indicates that he *assumes* that Ms. Leakas has CIRS due to mold exposure based on others' diagnosis, and then says that all of the tests and analyses he performed are consistent with that diagnosis. While Dr. Ross will be permitted to testify to a limited extent as discussed below, his opinions and proposed testimony are inadmissible as a differential diagnosis that Ms. Leakas's brain abnormalities were *caused* by CIRS.

Dr. Ross's report indicates that he examined Ms. Leakas, reviewed her medical and other records, reviewed literature, and conducted his own tests and analysis of her brain. He states that "[o]bjective evidence of acquired brain injury caused by mold-related illness" includes "[b]rain volume abnormalities" obtained using NeuroQuant® and NeuroGage® analyses of a May 2023 MRI of Ms. Leakas's brain. Dkt. No. 57-2, Ex. 1 at 27; *see also id*. at 4. As described by Dr. Ross in deposition, NeuroQuant® and NeuroGage® are proprietary software programs he created that are used to measure and analyze a patient's brain volume. Dr. Ross further testified that NeuroQuant® is FDA-cleared to measure MRI brain volume in human subjects and "can be objective evidence of brain injury," but is "not approved to diagnose any disease" or to "predict Alzheimer's or any other disease." *See* Dkt. No. 53-1, Ex. B (Ross Dep. at 18:4-22, 27:14-

28:13)).  He testified that NeuroGage® is a program that runs data obtained from NeuroQuant® and is used primarily "to look for objective signs of brain injury or disease."  *See id*. (Ross Dep. at 28:14-25).  According to Dr. Ross, NeuroGage® does not have FDA clearance, but can "predict whether a subject's brain MRI is more consistent with the pattern seen with chronic, mild, or moderate traumatic brain injury, or the pattern most commonly seen with normal controls."  *See id*. (Ross Dep. at 28:14-16, 29:7-16).

With respect to Ms. Leakas, Dr. Ross noted that her May 2023 MRI "showed that she had multiple volume abnormalities that was [sic] consistent with the pattern known to occur in acquired brain injury caused by CIRS."  Dkt. No. 57-2, Ex. 1 at 4, 27.  According to Dr. Ross, Ms. Leakas has "markedly abnormal asymmetry of the cerebral white matter" that "correlated with her extensive neuropsychiatric symptoms," and that "[s]everal of her brain volume abnormalities correlated with her clinical symptoms."  *Id*. at 5, 27.  In particular, Dr. Ross stated that Ms. Leakas's brain volume appeared, in places, to be smaller than or equal to that of women over twice her age.  *See id*. at 5, 27 ("The volume of her right middle frontal cortex was less than that of an average 100-year-old woman, and the volume of her left middle temporal cortex was equal to that of an average normal 89-year-old woman.").  Dr. Ross stated that "[t]hese findings are consistent with chronic effects of CIRS and indicated the extent of [Ms. Leakas]'s brain volume abnormalities," but he did not specify what neuropsychiatric or clinical symptoms reportedly correlated with Ms. Leakas's brain volume abnormalities.  *See id*. at 5, 27.

Defendants contend that NeuroGage® has not been sufficiently tested or used in the medical community to ensure the reliability of Dr. Ross's opinion that Ms. Leakas's brain abnormalities were caused by mold-related CIRS.  Plaintiffs argue that NeuroGage® cannot be considered in isolation from NeuroQuant®, because the two programs generally are used in tandem, as Dr. Ross apparently did in analyzing Ms. Leakas's brain volume.  They also present articles, which they say are peer-reviewed, discussing the use of NeuroQuant® in studies of structural brain changes in patients with inflammatory illnesses acquired after exposure to water-damaged buildings, as well as one article by Dr. Ross himself (and others), asserting that NeuroQuant® and NeuroGage® have been allowed as evidence in various litigation matters.  *See*

10

Dkt. No. 69, Exs. 1, 2, 5. Plaintiffs also generally cite to one of those litigation matters that they say also concerns alleged toxic mold contamination on military property,[5] but they have not directed the Court to any particular document or decision from that case corroborating Dr. Ross's assertion or the particular circumstances surrounding the evidentiary value of NeuroQuant® and NeuroGage® in that case. Plaintiffs contend that this evidence demonstrates that any dispute regarding Dr. Ross's NeuroQuant® and NeuroGage® analyses, at most, goes to the weight of his testimony, rather than its admissibility.

Dr. Ross may testify about his testing and analysis of Ms. Leakas's brain, including his use of NeuroQuant® and NeuroGage®, and what that testing and analysis shows with respect to Ms. Leakas's neuropsychiatric symptoms and conditions. As discussed above, Dr. Ross may also testify about whether and to what Ms. Leakas's neuropsychiatric symptoms and conditions may be *consistent* with neuropsychiatric symptoms or conditions he has observed in his treatment of patients with mold-related brain injuries. To the extent defendants contend that Dr. Ross's NeuroQuant® and NeuroGage® analysis of a single May 2023 MRI was inconsistent with his general practice or procedure, they may probe that issue on cross-examination. However, the record indisputably demonstrates that NeuroQuant® and NeuroGage® are not diagnostic tools for CIRS, or mold exposure, or mold-related illness, and are not FDA-cleared for such purposes. Accordingly, Dr. Ross is not permitted to testify or offer opinions that his NeuroQuant® and NeuroGage® analysis indicates that Ms. Leakas's brain abnormalities were *caused* by CIRS due to mold exposure.

At the motion hearing, plaintiffs stated that Dr. Ross's assertion that Ms. Leakas's brain abnormalities are "consistent with the pattern known to occur in acquired brain injury caused by CIRS" has support in scientific/medical literature—namely, a 2014 article by Ritchie C. Shoemaker (and others) and a 2016 article by S.W. McMahon (and others). Dr. Ross does cite to those articles in his report, although he appears to cite them for the proposition that mold-related illness is "associated with abnormal enlargement of multiple brain regions," whereas he seemed to

---

[5] *See Federico, et al. v. Mid-Atlantic Family Comms., LLC*, No. 1:12-cv-00080-RAJ, DEM.

observe abnormally small regions in Ms. Leakas's brain. Dkt. No. 57-2, Ex. 1 at 26; *see also* Dkt. No. 69, Exs. 1, 2. Whether or not that may be an inconsistency in Dr. Ross's explanation for his findings is a matter for cross-examination at trial. Plaintiffs have not, in any event, met their burden to show that Dr. Ross's differential diagnosis is sufficiently reliable to permit his proposed testimony that Ms. Leakas's acquired brain injury was *caused* by CIRS.

Plaintiffs misplace their reliance on *Brancati v. Cachuma Village, LLC*, 96 Cal. App. 5th 499 (2023), which is readily distinguishable from the present action in at least two significant respects. Unlike the present matter, test data regarding the property at issue in *Brancati* revealed "*high levels*" of mold. *Brancati*, 96 Cal. App. 5th at 436. Additionally, the expert in question was a board-certified allergist and immunologist who opined about the adverse impacts of mold on the plaintiff's respiratory tract—a recognized health impact of exposure to mold. *Id.* at 430. While plaintiffs have submitted articles that appear generally to espouse the view that human exposure to mold may cause an inflammatory response, leading to neurologic and neuropsychiatric symptoms (*see* Dkt. No. 69), for the reasons discussed above, the Court finds that they have not met their burden to establish that Dr. Ross has, more likely than not, reliably linked the cause of Ms. Leakas's brain abnormalities to plaintiffs' alleged exposure to mold from years ago.

## IV.   CONCLUSION

Based on the foregoing, defendants' motion to exclude the testimony of Dr. Ross is granted in part and denied in part. Dr. Ross will not be permitted to opine or testify that Ms. Leakas has an acquired brain injury that was caused by CIRS due to mold exposure. He also will not be permitted to testify about Ms. Leakas's long-term care or life-care planning needs. Dr. Ross will otherwise be permitted to testify to a limited extent, consistent with the rulings above.

**IT IS SO ORDERED.**

Dated: February 8, 2024

*Virginia K. DeMarchi*
Virginia K. DeMarchi
United States Magistrate Judge